UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HOME PRODUCTS INTERNATIONAL, INC., | ) | Case No. 22-06276 |
| *et al.,*[1] | ) | |
| | ) | Honorable Janet S. Baer |
| Debtors. | ) | |
| | ) | (Joint Administration Requested) |
| | ) | |

## **DECLARATION OF JAMES AUKER IN SUPPORT OF FIRST DAY MOTIONS**

I, James Auker, state the following under penalty of perjury:

1.      I am the Secretary, Treasurer, Executive Vice President and Chief Financial Officer of Home Products International, Inc. ("HPI") and Home Products International – North America, Inc. ("HPI-NA"), the debtors and debtors-in-possession (the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"). I am familiar with the Debtors' day-to-day operations, business affairs and books and records.

2.      I submit this declaration in support of the first-day applications and motions filed contemporaneously herewith in the Chapter 11 Cases.  Except as otherwise indicated, all of the facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents or information received from the Debtors' employees under my supervision or other employees whose duties encompass the matters about which they have provided the information. If I were called as a witness, I could and would testify competently to the factual statements set forth herein. All capitalized terms used but not defined herein shall have the meanings given them in the respective motions.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal identification number are: Home Products International, Inc. (7027) and Home Products International-North America, Inc. (0451).

## I.    BACKGROUND OF THE DEBTORS

3.    HPI-NA manufactures a variety of household and commercial products, including plastic storage totes, carts, and bins, at its plant in Chicago, Illinois and steel ironing boards at its plant in Seymour, Indiana.  HPI-NA is the only ironing board manufacturer located in the United States.

4.    The Debtors' major customers include Walmart, Target, Amazon, Ace Hardware, Family Dollar, Uline, and numerous hospitality chains such as Hyatt, Marriott, Red Roof, and Hilton.  Their brand names include Homz® and Durabilt Extreme Storage®.

5.    The Debtors currently employ approximately 74 employees, 41 of whom work at the Debtors' Chicago plant and 32 of whom work at the Debtors' Seymour plant, and one in Bentonville, Arkansas.

6.    HPI-NA is a wholly owned subsidiary of HPI, which is headquartered in Chicago, Illinois, and has been doing business in Chicago for nearly 70 years.  HPI-NA (i) rents its storage and warehouse spaces (approximately 494,420 square feet of space at the Midway Business Center, Chicago Illinois) and office location (4501 West 47th Street, Chicago, IL 60632) in Chicago, Illinois, and (ii) owns its plants in Seymour, Indiana (885 N. Chestnut Rd, 201 S. Jackson Park Dr, 400 S. Airport Rd, 110 W. 9th St – Seymour, IN 47274) (the "Seymour Real Property").  Assets of HPI-NA include the real property in Seymour, and the machinery and equipment, inventory, raw materials and other assets located at both plants.

7.    HPI-NA is the borrower under the Prepetition Loan Agreement (as described below) and a guarantor under the Second Lien Loan Documents (as described below).  Accordingly, its liabilities include (i) the First Lien Obligations and the Second Lien Obligations (each as described below), and (ii) unsecured debt in the approximate amount of $19.5 million.

2

8.     HPI is the parent holding company of HPI-NA, and does not own any real or personal property, but holds 100% of the stock of HPI-NA, which is estimated to be worth $0. HPI is the borrower under the Second Lien Loan Documents and an obligor under the Prepetition Loan Agreement.  Accordingly, its liabilities include the First Lien Obligations and the Second Lien Obligations (each as described below).

## II.     FINANCIAL STRUCTURE

### A.     First Lien Secured Debt with Eclipse.

9.     HPI-NA, as Borrower, and HPI, as Loan Party Obligor, are parties to that certain Loan and Security Agreement, dated of February 28, 2019 (as amended by that certain First Amendment to Loan and Security Agreement dated as of January 15, 2020, that certain Second Amendment to Loan And Security Agreement dated as of September 25, 2020, and that certain Third Amendment to Loan and Security Agreement dated as of December 17, 2020, and as further amended or otherwise modified from time to time, the "Prepetition Loan Agreement" and collectively with all other documents executed in Prepetition Loan, the "Prepetition Documents"), with Eclipse Business Capital SPV, LLC f/k/a Encina Business Credit SPV, LLC ("Eclipse" or the "First Lien Agent", acting on behalf of itself and the lenders under the Prepetition Loan Agreement), pursuant to which First Lien Agent agreed to make certain revolving and term loans to HPI-NA (the "Prepetition Loans"), in exchange for a first lien on and security interest (the "Prepetition Liens") in and against all assets of HPI-NA, including all real estate, including the Seymour Real Property, and personal property, now or hereafter acquired, and the proceeds thereof (the "Prepetition Collateral").

10.     The initial loans and advances made under the Prepetition Documents were used by HPI-NA to refinance then-outstanding obligations and liabilities under an existing credit agreement with BMO Harris Bank N.A., and the other lenders thereto.

3

11.     The Debtors and the First Lien Agent entered into that certain Forbearance Agreement and Sixth Amendment to Loan and Security Agreement on November 11, 2021, which has since expired in accordance with its terms.

12.     The Debtors and the First Lien Agent entered into that certain Second Forbearance Agreement and Seventh Amendment to Loan and Security Agreement on December 17, 2021, which has since expired in accordance with its terms.

13.     The Debtors and the First Lien Agent entered into that certain Third Forbearance Agreement and Seventh Amendment to Loan and Security Agreement on March 14, 2022 (the "Third Forbearance Agreement"), which has since expired in accordance with its terms. The Debtors have been unable to negotiate an extension to the Third Forbearance Agreement.

14.     As of the Petition Date, the total outstanding obligations owed by HPI-NA, as borrower, and HPI, as obligor, to the First Lien Agent under the Prepetition Documents is $16,921,060.81, broken down as follows: (a) outstanding Revolving Loans (as defined in the Prepetition  Documents) in the principal amount of $13,031,058.81, (b) outstanding M&E Term Loans (as defined in the Prepetition Documents) in the principal amount of $2,264,377.00, and (c) outstanding Real Estate Term Loans (as defined in the Prepetition Documents) in the principal amount of $1,400,625.00 (collectively, the "First Lien Obligations").

**B.      Second Lien Secured Debt.**

15.     On December 20, 2006, the Debtors filed for bankruptcy protection in the United States Bankruptcy Courts for the District of Delaware (Case Nos. 06-11457 and 06-11458).

16.     On March 8, 2007, the Debtors confirmed a plan of reorganization that resulted in a more streamlined and efficient business, focusing on the Chicago and Indiana manufacturing plants.

4

17.    As part of the exit from restructuring, HPI, as borrower, entered into that certain Securities Purchase Agreement dated as of March 20, 2007 (the "Original Agreement") with certain Persons listed as purchasers on the signature pages thereof or who otherwise agreed to be bound as purchasers (collectively, the "Initial Purchasers"), HSBC Bank USA, N.A., as the agent, and the collateral agent, pursuant to which Borrower issued the 2007 Notes (as defined below) to the Initial Purchasers.

18.    HPI, certain Holders of the 2007 Notes and HSBC Bank USA, N.A. as the agent and the collateral agent, amended and restated the Original Agreement pursuant to the Amended and Restated Securities Purchase Agreement dated as of June 19, 2012 (the "First Restated Agreement").

19.    HPI offered to the Holders of the Notes then outstanding under the First Restated Agreement (the "2007 Notes") the opportunity to exchange (the "First Exchange Offer") their 2007 Notes for a new series of Notes designated as its 6% Senior Secured Convertible Notes due 2017 (the "2017 Notes") pursuant to the terms and conditions of an Offering Memorandum and Letter of Transmittal, each dated January 12, 2017, as amended pursuant to terms thereof.

20.    HPI, certain Holders of the 2007 Notes and HSBC Bank USA, N.A. as the agent and the collateral agent amended and restated the First Restated Agreement pursuant to the Second Amended and Restated Securities Purchase Agreement dated as of March 6, 2017 (the "Second Restated Agreement").    In connection with the Second Restated Agreement, HPI-NA, as guarantor, entered into that certain Continuing Guaranty Agreement which guarantees the obligations of HPI under the Second Restated Agreement.

21.    HPI offered to the Holders of the 2017 Notes currently outstanding under the Second Restated Agreement the opportunity to exchange (the "Second Exchange Offer") their

5

2017 Notes for up to $20,000,000 total aggregate principal amount of a new series of Notes created and issued thereunder designated as its 6% Senior Secured Notes due 2022 (the "2022 Notes" or the "Notes") and $25,200,233 of its Series A Preferred Stock (the "Preferred Stock") pursuant to the terms and conditions of an Offering Memorandum and Letter of Transmittal, each dated September 28, 2017, as amended pursuant to terms thereof.

22.     HPI, certain Holders of the Notes, GLAS USA LLC, as the Agent, and GLAS AMERICAS LLC, as the Collateral Agent (and together with Agent, collectively, the "Second Lien Agent", and further together with the Holders of Notes, the "Second Lien Lenders"), amended and restated the Second Restated Agreement pursuant to the Third Amended and Restated Securities Purchase Agreement dated as of October 31, 2017 (the "Third Restated Agreement"). In connection with the Third Restated Agreement, HPI-NA, as guarantor, entered into that certain Amended and Restated Continuing Guaranty Agreement which guarantees the obligations of HPI under the Third Restated Agreement (the "HPI-NA Guaranty").

23.     In connection with entry into the Prepetition Documents, HPI, certain Holders of the Notes, and the Second Lien Agent, amended and restated the Third Restated Agreement pursuant to the Forth Amended and Restated Securities Purchase Agreement, dated as of February 28, 2019 (as amended from time to time, the "Fourth Restated Agreement", and together with all ancillary documents related thereto, including any instruments or documents executed at any time in connection therewith or related thereto and applicable law, the "Second Lien Loan Documents").

24.     Pursuant to the Second Lien Loan Documents, HPI granted to the Second Lien Lenders a lien on and security interest (the "Second Lien Security Interest") in and against all assets of HPI, including all real estate and personal property, now or hereafter acquired, and the

6

proceeds thereof (the "Second Lien Collateral").[2]  The HPI-NA extends to the obligations of HPI

under the Second Lien Loan Documents.

25.     The Debtors failed to pay the October 2021 interest payment and the April 2022

interest payments that were due the Second Lien Lenders due to lack of liquidity driven by adverse

business conditions, including raw materials price inflation and the inability to pass those increases

along to customers.  The Debtors are not in a position to repay the outstanding 2022 Notes when

they are due on December 20, 2022.

26.     As of the Petition Date, the total outstanding obligations owed by HPI, as borrower,

and HPI-NA, as guarantor, to the Second Lien Lenders under the Second Lien Loan Documents

are (i) $20 million in principal due on December 20, 2022, and (ii) $1,562,821.46 in unpaid interest

that is due and owing (collectively, the "Second Lien Obligations").

**C.      Intercreditor Agreement.**

27.     In connection with the entry into the Prepetition Documents and the Second Lien

Documents, the First Lien Agent and the Second Lien Agent entered into that certain Intercreditor

Agreement, dated as of February 28, 2019, pursuant to which the parties thereto acknowledged

that the Prepetition Liens are superior to and have priority over the Second Lien Security Interests

with respect to the Collateral.

**D.      The Reasons for Chapter 11.**

28.     The Debtors utilize resin to produce plastic storage products and steel to produce

ironing boards.  The price of resin and steel has been extremely volatile during the past two years,

with resin prices doubling and steel prices tripling.  The Debtors have had only moderate success

passing along those price increases to its customer base.  In addition, labor costs, transportation

---

[2] The Prepetition Collateral and Second Lien Collateral are collectively referred to herein as the "Collateral".

costs, and utility costs have increased markedly as well—all of which have led to increased production costs. At the same time, supply chain issues and funding issues have caused gaps in production. In other words, while there is significant demand for its products, margins remain low, reducing cash flow and leading to the inability to fully fund the business.

29.    Over the past six months, the Debtors have negotiated and executed a series of forbearance agreements with Eclipse in the hopes that the market conditions would stabilize. During this same time period, the Debtors engaged professionals (including appointing Daniel Rose from Silverman Consulting as the Chief Restructuring Officer on February 28, 2022) to assist them.

30.    At this point, seemingly nothing will change the trajectory of the plastics and ironing board business lines. Neither resin nor steel prices are expected to moderate sufficiently in the near future. The supply chain crisis is not expected to change in the near future. Eclipse is no longer willing to advance funds to the Debtors to cover the Debtors' continuing operating losses. And, finally, the Debtors have not at this point been able to secure any going concern purchasers for either of its plastics or ironing board business lines. Despite actively seeking funding from Eclipse and other sources and actively trying to sell the Debtors' business as a going-concern in order to prevent a shutdown of businesses, the need for winding down the business became imminent.

31.    Accordingly, on March 15, 2022, HPI-NA announced the closing of its Seymour operation and issued WARN Act Notices to its employees in Seymour, Indiana. The Debtors' decision to issue WARN Act notices to its Seymour employees on March 15, 2022 was a direct result of Debtors' inability to secure a going concern bidder for the ironing board business or obtain financing from Eclipse (or an alternative funding source) for the ironing board business on a long-

4879-8155-2920.14

term basis.  As a result, the Debtors began the orderly wind-down of the Debtors' ironing board business in Seymour.  At the time this decision was made in March, the Debtors anticipated that they would eventually shutter the Seymour plant, and then reduce enough overhead expenses and costs to save the plastics business in Chicago or find a going concern purchaser for the plastics business.

32.    Unfortunately, the same fate awaited the plastics business, as commodity inflation has accelerated and general business conditions in the United States have deteriorated since March 2022.  The Debtors have not been able to secure a going concern purchaser for the plastics business, and could not obtain financing from Eclipse (or any other funding source) on any basis other than a path that would result in the orderly wind-down of the plastics business.

33.    At this point, despite its active, ongoing efforts to secure additional capital or sell the businesses as going-concerns, the Debtors have elected to file for Chapter 11 in order effectuate an orderly wind-down of its businesses.  The Debtors will continue to fill as many pending orders as they can with inventory on hand, until the end of June (based on the current inventory levels). The Debtors are also actively working with their customers to collect on existing accounts receivable.  It is currently anticipated that the collections process (which, in many respects, is tied to the order filing process) will continue until at least July.

**E.    Sale Efforts.**

34.    The Debtors hired professionals earlier in the year, namely Silverman Consulting (first as turnaround advisors and then expanded to include a Chief Restructuring Officer role), Cushman Wakefield (real estate brokers), and Promontory Point Capital (investment bankers), to market the Debtors' two business lines in an effort to find a going-concern purchaser for the Debtors' businesses and/or sell the Debtors' real property and personal property.

9

35.     Ultimately, the Debtors' professionals were unable to find any going concern purchasers, but they were able to structure contracts regarding the sale and purchase of some of the Debtors' real and personal property.

36.     Specifically, the Debtors have entered into that certain Purchase Agreement dated as of May 19, 2022 (as amended, supplemented, or otherwise modified by that certain Counter Offer #4 dated as of May 27, 2022), between HPI-NA and TDAK Development, Inc. (the "TDAK Real Estate Agreement"), in connection with the sale of the property commonly known as 201 S. Jackson Park Dr., 400 South Airport Road, Seymour, Indiana for $3 million.  A copy of the TDAK Real Estate Agreement is attached hereto as Exhibit A.

37.     The Debtors have entered into that certain Auction Agreement, dated as of May 27, 2022 (the "Auctioneer Agreement"), by and among HPI-NA, Hyperams, LLC, and Branford Auctions, LLC (collectively, the "Auctioneer"), pursuant to which the Debtors have engaged the Auctioneers to sell machinery and equipment at both the Chicago and Seymour plants, for a guaranteed a sale price of no less than $3.8 million.  A copy of the Auctioneer Agreement is attached hereto as Exhibit B.

38.     The Debtors expect to file a series of "second day" motions to facilitate the aforementioned sales and continued wind-down of the Debtors' businesses, i.e., a motion retain the Auctioneer; motions to approve the sale of its real and personal property under the respective agreements pursuant to Section 363 of the Bankruptcy Code; motions to retain Silverman Consultants and Foley and Lardner (both whom have critical pre-petition knowledge of the aforementioned sales and the Debtors' wind-down plans); and a motion to retain Blank Rome (to assist on certain tariff issues).

39.     All of these motions will need to move on shortened notice as I am of the opinion that the current economic conditions in the United States are deteriorating rapidly and that is likely that the value of the Debtors' assets will continue to decrease as the weeks and months progress.

40.     At this point, the Debtors intend to use the Chapter 11 process to continue to wind down their businesses in an orderly manner and then ultimately file a liquidating plan once all operations have ceased and the aforementioned asset sales are completed.  It is highly likely that there will no payout for unsecured creditors and it is highly likely that the Second Lien Lenders will incur a significant write down of their debts based on the Debtors' best estimates.

## III.     FIRST DAY MOTIONS

41.     Concurrently with the filing of these Chapter 11 Cases, the Debtors have filed a number of First-Day Motions, which are described briefly below.  I have reviewed each of the First-Day Motions (including the exhibits thereto), and I believe that the relief sought in each of the First-Day Motions (a) is necessary to enable the Debtors to operate in chapter 11 with a minimum of disruption or loss of business, (b) constitutes a critical element in achieving a successful conclusion to the Chapter 11 Cases of the Debtors and (c) is in the best interests of the Debtors, their estates and parties in interest.

42.     The First-Day Motions seek relief aimed at, among other things, maintaining customer loyalty and supplier confidence, as well as maintaining employee morale.  The First-Day Motions consist of the following pleadings (some of which will be noticed for further hearing):

- Debtors' Motion for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases (the "Joint Administration Motion");

- Debtors' Motion for Entry of an Order (I) Extending Time Within Which to File Schedules and Statements of Financial Affairs, and (II) Granting Related Relief (the "Extension Motion");

- Motion for Entry of an Order (I) Authorizing Consolidated Creditors Lists, (II) Authorizing Redaction of Certain Personal Identification Information, (III)

11

Limiting the Scope of Notice, and (IV) Approving the Form and Manner of Notifying Creditors of the Commencement of the Chapter 11 Cases (the "Consolidated Creditors Motion");

- Debtors' Consensual Motion for Interim and Final Order (I) Authorizing Debtors to Use Cash Collateral, (II) Granting Adequate Protection to Eclipse Business Capital LLC, as Agent, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief (the "Cash Collateral Motion");

- Debtors' Motion for Entry of Order Authorizing (A) Continued Use of (I) Existing Bank Accounts and (II) Business Forms and (III) Cash Management System and (B) Waiver of Investment Guidelines (the "Cash Management Motion"); and

- Debtors' Motion for Entry of Order (A) Authorizing (I) Payment of Employee Wages, Salaries, and Accrued Prepetition Benefits, (II) Contributions to Employee Benefit Plans, (III) Payment of Funds Deducted From Payroll, and (IV) Reimbursement of Employee Expenses, and (B) Directing All Banks to Honor Related Checks (the "Wages Motion").

## B.    **Administrative Motions**

### i.    **The Joint Administration Motion**

43.    By the Joint Administration Motion, the Debtors request entry of the Proposed Order, pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 1015, directing the joint administration and consolidation of the Chapter 11 Cases for procedural purposes only.

44.    Many of the motions, applications, hearings, and orders that will arise in these Chapter 11 Cases will jointly affect the Debtors.  More importantly, the Debtors' finances are intertwined.  For these reasons, the joint administration of these Chapter 11 Cases—for procedural purposes only—would best serve the interests of the Debtors, their creditors, and other parties in interest, and will allow for an efficient and economical administration of the Chapter 11 Cases.

45.    For the foregoing reasons, the Debtors submit, and I believe that the relief requested in the Joint Administration Motion is in the best interest of the Debtors, their estates and their creditors, and therefore should be approved.

4879-8155-2920.14

### ii.    The Extension Motion

46.    By the Extension Motion, the Debtors seek an order extending the time by which to file the Schedules and Statements for an additional 30 days to and including June 16, 2022.

47.    The Debtors have already commenced the extensive process of gathering the necessary information to prepare and finalize the Schedules and Statements, but believe that the fourteen-day period to file the Schedules and Statements provided by Bankruptcy Rule 1007(c) will not be sufficient to permit completion of the Schedules and Statements.

48.    The Debtors have hundreds of parties in interest.  While preparations have begun, Debtors have not had a sufficient opportunity to gather the necessary information to prepare and file their Schedules and Statements.  Although the Schedules and Statements were not filed with the Debtors' petitions, attached to the Debtors' petitions was a list containing the names and addresses of their thirty largest unsecured creditors.  The Debtors also filed their consolidated creditor matrix along with their petitions.

49.    The Debtors estimate that, at this juncture, it will require an additional 30 days (for a total of 44 days), to and including June 16, 2022, by which to file their Schedules and Statements. The Debtors thus request that the Court establish June 16, 2022 as the date on or before which each must file their Schedules and Statements, without prejudice to the Debtors' right to seek any further extensions from this Court, or to seek a waiver of the requirement of filing certain schedules.

50.    For the foregoing reasons, the Debtors submit, and I believe, that the relief requested in the Extension Motion is in the best interest of the Debtors, their estates and their creditors, and therefore should be approved.

4879-8155-2920.14

### iii.    The Consolidated Creditors Motion

51.    For the same reasons, Debtors submit, and I believe that the relief requested in the Consolidated Creditors Motion would best serve the interests of the Debtors, their creditors, and other parties in interest and will allow for efficient and economical administration of the Chapter 11 Cases.

52.    By the Consolidated Creditors Motion, the Debtors seek an order from the Court (i) authorizing the Debtors to file a consolidated creditor matrix in lieu of submitting separate mailing matrices and creditor lists for each Debtor, (ii) authorizing the Debtors to redact certain personal identification information for individual creditors, (iii) approving a limited notice procedure for the Debtors' employees; (iv) approving service on equity holders through the Debtors' Stock Transfer Agent, and (v) approving the form and manner of notice of commencement of these Chapter 11 Cases and the scheduling of the meeting of creditors under section 341 of the Bankruptcy Code

53.    A consolidated creditor matrix will alleviate an unnecessary burden for the Court, the Debtors, and the Debtors' professionals while the Debtors are adjusting to bankruptcy and focusing on developing a value-maximizing chapter 11 plan and a sale process to effectuate an ordering wind down.

54.    Moreover, the Debtors request permission to redact certain information of individual creditors in the creditor matrix and in the Debtors' Schedules—namely, the Debtors' employees—from the Creditor Matrix and from the Schedules filed by each Debtor because such information is sensitive and could be used to perpetrate identity theft.

55.    For the foregoing reasons, the Debtors submit, and I believe that the relief requested in the Consolidated Creditors Motion is in the best interest of the Debtors, their estates and their creditors, and therefore should be approved.

14

C. **Business Operations**

i. **The Cash Management Motion**

56.     Before the Petition Date, the Debtors in the ordinary course of business, maintained several bank accounts (the "Bank Accounts"). A true and correct list of the Bank Accounts is included in the Cash Management Motion and is as follows:

| Account | Entity | Description | Bank |
|---------|--------|-------------|------|
| xxx0625 | HPI-NA | Disbursements Account | BMO Harris Bank |
| xxx0674 | HPI-NA | Receipts Account | BMO Harris Bank |
| xxx1655 | HPI-NA | Restricted Cash | BMO Harris Bank |

57.     The Debtors seek a waiver of the U.S. Trustee's requirement that the Bank Accounts be closed and new postpetition bank accounts be opened. Maintenance of the Bank Accounts would greatly facilitate the Debtors' "seamless transition" to postpetition operations. The delays, confusion and disruption that might result from requiring the Debtors to substitute new bank accounts for the existing Bank Accounts could strain their relationships with various critical parties in interest, including vendors and employees.

58.     It will facilitate the Debtors' reorganization efforts if they are permitted to deposit and withdraw funds from the Bank Accounts by all usual means, including, without limitation, checks, wire transfers, Automated Clearing House transfers and other debits.

59.     In order to minimize expense to their estates, the Debtors request authority to continue to use all stationery, correspondence and business forms (including, but not limited to, purchase orders, multi-copy checks, letterhead, envelopes, promotional materials and other business forms), as well as checks existing immediately before the Petition Date, without reference

15

to their status as debtors-in-possession.  The Debtors intend to purchase new business forms during

the pendency of these Chapter 11 Cases, without any legend reflecting the Debtors' status as

debtors-in-possession.

60.    The Debtors, in the ordinary course of their business, use various preprinted

business forms.  A substantial amount of time and expense would be required in order to print new

business forms, and many of the parties with whom the Debtors deal could be confused by a change

in the Debtors' forms.  Furthermore, parties doing business with the Debtors will be aware of the

Debtors' status as chapter 11 debtors-in-possession.  Accordingly, changing such forms would be

unnecessary and burdensome to the estates, as well as expensive and disruptive to the Debtors'

business operations.

61.    The Debtors seek authority to continue utilizing their current cash management

system. HPI does not maintain any bank accounts or investment accounts.  As explained in the

Auker Declaration, all business is transacted through HPI-NA.

62.    HPI-NA uses, in the ordinary course of its business, a centralized, integrated cash

management system to collect funds from its operations and to pay operating and administrative

expenses in connection with those operations (the "Cash Management System").  As shown above,

this system consisted of three bank accounts (collectively, the "BMO Accounts") maintained at

BMO Harris Bank, N.A. ("BMO"), an FDIC-insured banking institution that is on the list of

authorized depositories for the Northern District of Illinois.

63.    When HPI-NA receives a check or an ACH deposit, such funds are deposited into

the BMO Account bearing number xxx0674 (the "BMO Receipts Account").  At approximately

11:00 A.M. each day, the First Lien Agent sweeps the funds from the BMO Receipts Account to

16

its own account at another financial institution in accordance with the Prepetition Documents by and between the Debtors and the First Lien Agent.

64.    HPI-NA makes funding requests to the First Lien Agent on a daily basis. Once the First Lien Agent approves the request, it deposits funds into the BMO Account bearing number xxx0625 (the "BMO Disbursements Account"). The funds in the BMO Disbursements Account are used to fund all of HPI-NA's operations, including payroll, payments to vendors, and operational expenses. The funds deposited by the First Lien Agent pursuant to funding requests remain in the BMO Disbursement Account until they are used.

65.    HPI-NA also maintains a restricted cash account bearing number xxx1655 (the "BMO Restricted Cash Account") which is used to guarantee letters of credit for certain agreements including U.S. Customs duties.

66.    In the event the Debtors' operations result in a cash surplus, they intend to retain and use that cash in their continued operations or invest such funds in accordance with § 345 of the Bankruptcy Code, as modified by the Cash Management Motion.

67.    A successful reorganization of the Debtors' business, as well as the preservation and enhancement of their value as going concerns, simply cannot be accomplished if there is substantial disruption in the Cash Management System. Therefore, it is essential that the Debtors be permitted to continue their current management of cash. The Debtors currently maintain and will continue to maintain detailed accounting records of the Cash Management System.

68.    The basic transactions incident to the Cash Management System described above constitute customary and essential business practices. The Cash Management System is similar to those commonly employed by corporate enterprises comparable to the Debtors in size and complexity. The widespread use of such systems, moreover, is attributable to the numerous

4879-8155-2920.14

benefits they provide, including the ability to (a) control corporate funds, (b) invest idle cash, (c) ensure cash availability and (d) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate account information.

69.    The Debtors seek a waiver of the requirement of § 345(b) of the Bankruptcy Code that the estates secure from the entity with which its money is deposited or invested a bond in favor of the United States secured by the undertaking of an adequate corporate surety. All of the Debtors' bank accounts are in financially stable banking institutions insured by the Federal Deposit Insurance Corporation.  The Debtors submit that cause for a waiver of the requirements of § 345 of the Bankruptcy Code therefore exists in these Chapter 11 Cases.

**ii.    The Cash Collateral Motion**

70.    As described above, the Debtors intend to operate for a short period to fulfill standing orders, and then wind down their businesses and effectuate a sale of assets in Chicago and Indiana solely on the use of the existing Cash Collateral.  Access to existing Cash Collateral on an interim basis is essential to and will provide the Debtor with sufficient working capital and liquidity to operate its business until an ordinary wind down is completed, and thus preserve and maintain the value of the Debtors' estates.  Without access to such liquidity, the Debtors and their estates will suffer immediate and irreparable harm and these bankruptcy proceedings will be jeopardized to the significant detriment of the Debtors' estate and its creditors.  The Debtors' immediate access to Cash Collateral is necessary to preserve and maximize the value for the benefit of all parties in interest.

71.    In particular, the Debtors have an immediate and critical need to use Cash Collateral to pay, in accordance with a 13-week budget (the "Budget", a copy of which is attached to the Cash Collateral Motion), various items in the ordinary course of business and as authorized by the Court, including employees, employee benefits, utilities, material and shipping costs, and others

who, in the judgment of the Debtors' management, provide the essential services needed to operate, maintain and insure the Debtors' assets. At a minimum, the Debtors' inability to use Cash Collateral would disrupt Debtors' efforts to effectuate an orderly wind down and sale process, including fulfillment of pending outstanding orders, and would otherwise not be in the best interests of the Debtors, estates, or creditors.

72.     In addition, the Debtors require the use of Cash Collateral to retain and pay costs of professionals, consultants and advisors (e.g., Silverman Consultants, Foley & Lardner, and Blank Rome) who will enable the Debtors to conduct a sale of its assets in a manner that maximizes value for the Debtors' estate and creditors, as may be approved by the Court. Taken together, the services provided by all of the foregoing parties and other entities are critical to the preservation of the Debtors' business and asset value.

73.     The Debtors reasonably believe that use of Cash Collateral pursuant to the Budget will be adequate, considering all available assets, to pay all administrative expenses due or accruing during the period covered by the Budget, while they wind down their business and sell the Chicago and Indiana assets, as set forth in the Budget. At this time, Debtors do not anticipate a need for postpetition financing during the pendency of these Chapter 11 Cases, which will save thousands of dollars in fees and costs.

74.     Further, Eclipse has consented to the Debtors' use of Cash Collateral, solely pursuant to the terms and conditions as set forth in the Cash Collateral Motion, the proposed Interim Order, and the Budget attached thereto. The Budget is the result of significant negotiations with Eclipse to ensure the Debtors have the breathing room they need for an orderly wind-down of their business operations and to pursue asset sales which will maximize creditor recoveries.

4879-8155-2920.14

75.     As set forth in detail the Cash Collateral Motion, First Lien Agent shall remit to Debtors on a daily basis all Cash Collateral received in the BMO Receipts Account (or otherwise) for expense to be paid in accordance with the Budget, subject to the Permitted Variance, plus the Working Capital Cushion (as defined in the Interim Order).  First Lien Agent is authorized to apply all other Cash Collateral received (subject to any challenge during the investigation period): (i) first, to pay Allowable 506(b) Amounts (as defined in the Cash Collateral Motion); and (ii) second, to all other First Lien Obligations.

76.     In connection with the use of Cash Collateral, the Debtors have agreed to provide to the First Lien Agent as adequate protection, effective as of the Petition Date (but subject to an investigation period), valid and automatically perfected first-priority replacement liens and security interests in and on all real and personal property of the Debtors' bankruptcy estates, including Cash Collateral, which shall secure any diminution in value of the First Lien Agent's interests in the Collateral and the Debtors' use of Cash Collateral.  The Replacement Liens shall be subject and subordinate to a carve out for, among other things, UST and professional fees (the "Carve Out").

77.     As additional adequate protection (but subject to the investigation period), the Debtor shall pay to Eclipse, as set forth in the Budget, from and after the Petition Date, monthly payment of principal, interest and reasonable fees, costs, and expenses, including reasonable attorneys' fees and related expenses, due or to be due to the First Lien Agent under the Prepetition Documents (the "Adequate Protection Payments").

78.     As security for the payment of the Adequate Protection Obligations, the First Lien Agent shall have an allowed administrative expense claim under Code § 507(b), with priority in payment over:  (1) all costs and expenses of administration of the Case that are incurred under any

20

provision of the Code, including Code §§ 364, 503(b), 506(c), 507(a), or 552(b); provided, however, that such claims are subject to the Carve Out; and (2) the claims of any other party in interest under Code § 507(b).

79.    The Debtors believe that the terms of the use of Cash Collateral contained in the Cash Collateral Motion protect the First Lien Agent against any diminution in the value of its interests in the Cash Collateral resulting from the use, sale, or lease of the Cash Collateral.  Further, the subordination of the First Lien Agent's liens to the Carve Out and other priority liens are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by fair consideration.

80.    After considering its alternatives, the Debtors have concluded that the use of Cash Collateral pursuant to the terms of the Interim Order represents the best option available to interested parties, which funds will be used to maintain the Debtors' assets and maintain its high standards for the benefit of its residents during an orderly sale process.

### iii.    The Wages Motion

81.    The Debtors are seeking First-Day relief to be able to pay employee pre-petition wages and salaries and maintain employee benefits and programs.

82.    As of the Petition Date, Debtors employed approximately 74 employees, of whom approximately 73 are full-time, and one is part-time. 74 employees are employed at the Debtors' Chicago facility, and 32 are employed in the Seymour, Indiana facility. Debtors also have one employee in Bentonville, Arkansas. Approximately 27 of the employees are hourly wage earners and 47are salaried employees.  10 of the employees in the Chicago facility are members of the Plastic Workers' Union Local #18, AFL-CIO (the "Union").

83.    The average monthly payroll for Debtors' employees has historically been $1,260,000.00, however this number will decrease substantially as the Debtors have recently laid

off the majority of their hourly workers. Salaried employees are generally paid on a bi-weekly basis, and hourly employees are generally paid on a weekly basis. The prepetition amount of payment to be paid postpetition under this Motion is approximately $ approximately $14,417 for May 30 through June 1, 2022. The next payroll date, which will include these amounts, for the hourly wage earners is June 10, 2022.[3]

84.     None of the Debtors' employees are owed more than $15,150 for prepetition wages, salaries or commissions.

85.     Debtors offer their employees other forms of compensation through employee benefit programs, which are set forth in the Wages Motion at Paragraph 11. Debtors estimate that they owe $27,500 on account of their health insurance plan for their Chicago employees for the month of June. In addition, the Debtors estimate that they owe approximately $30,000 for other prepetition amounts, including the Debtors' required contributions to the union retirement and health reimbursement accounts, contributions from employees for various voluntary benefit programs, fees for staffing agencies, and payroll processing fees. Through the Wages Motion, the Debtors seek the authority, in their discretion, to pay these amounts and continue the Employee Benefit Plans as they existed before the Chapter 11 Cases were filed.

86.     Many of the Debtors' employees are completely reliant on the timely payment of their compensation to cover their monthly living expenses. Failure to allow full payment of these amounts would inflict great hardship on the employees and would likely result in many of them terminating employment with the Debtors. Moreover, nonpayment of these amounts would seriously damage morale at a time when the Debtors can ill afford to be without the full commitment of their employees.

---

[3] Salaried employees have been paid through June 3, 2022 and consequently, there are no prepetition wages owed to those employees.

4879-8155-2920.14

87.    Payment of the Prepetition Compensation and Benefits and continuing, the employee benefit programs are vital to ensure a continued, well-qualified workforce at the Debtors and thus the continued smooth operation of the Debtors' business as they proceed to an orderly liquidation.

## IV.    <u>CONCLUSION</u>

The relief requested in the First-Day Motions is necessary and in the best interests of the Debtors' estates, creditors, and other parties in interest.  Such relief will enable the Debtors to maintain the value of their business, rapidly conclude these Chapter 11 Cases and thereby maximize recoveries for all stakeholders.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Chicago, Illinois
Date: June 2, 2022

James Anker
Secretary, Treasurer, Executive Vice President
and Chief Financial Officer
Home Products International, Inc.

# Exhibit A

Authentisign ID: 72896A1F-DE44-4712-A234-0449FC5D1779

| Listing Broker (Co.) **Cushman Wakefield** | ( ) By **Fritz Kauffman** | ( ) |
| | *office code* | *individual code* |
| Selling Broker (Co.) **Millman Realty Partners** | ( ) By **Rob Millman** | ( ) |
| | *office code* | *individual code* |

*Provided as a member service by the*
**INDIANA ASSOCIATION OF REALTORS®, INC.**

# PURCHASE AGREEMENT
## COMMERCIAL-INDUSTRIAL REAL ESTATE
### For use only by members of the Indiana Association of REALTORS®

DATE: **May 19, 2022**

1  **A.  PARTIES:  Home Products International - North America**
2  _____ ("Seller")
3  agrees to sell and convey to **TDAK Development, Inc.**
4  _____ ("Buyer")
5  and Buyer agrees to buy from Seller the following property for the consideration and subject to the following:
6  **B.  PROPERTY:** The property is commonly known as _____
7  **201 S. Jackson Park Dr., 400  South Airport Road, Seymour,   47274** ,
8  in **Jackson** Township, **Jackson** County, **Seymour** Indiana, **47274**
9  including all buildings and permanent improvements and fixtures attached owned by Seller; all privileges, easements and
10 appurtenances pertaining thereto including any right, title and interest of Seller in and to adjacent streets, alleys, rights-of-way,
11 leases, rents, security deposits, licenses and permits with respect to the property, trade name, and warranties or guaranties
12 relating to the property being sold, and any personal property specified herein; all of the above referred to as the "Property," the
13 legal description of which is [X] **(attached as Exhibit "A")** [ ] **(described as follows): PT NE SE 17-6-6 10.52AC A QCD FOR**
14 **0.23 ACRES ON 01/14/14 TO CLEAR UP CHAIN OF TITLE INS # 201400286;  PT SIBL 24-6-5 11.765A**
15 _____ ; subject to exact determination by survey pursuant to Paragraph J.
16 **The following items of personal property are INCLUDED in the sale: None**
17 _____ .
18 **All other personal property and the following additional items are EXCLUDED from the sale:** _____
19 _____ .
20 **C.  PRICE:** The purchase price shall be                              **Three Million**                              Dollars
21 ($ **3,000,000.00** ) U.S. Dollars, payable [ ] **(in cash at closing)** [X] **(in accordance with the terms and conditions in this**
22 **Agreement).**
23 **D.  EARNEST MONEY:** Buyer submits $ **50,000.00** U.S. Dollars as Earnest Money to be held by **Seymour Abstract &**
24 **Title** as Escrow Agent within **5** days of execution and
25 receipt of this Agreement by both parties. **If Buyer fails for any reason to timely submit Earnest Money, Seller may**
26 **terminate this Agreement upon notice to Buyer prior to Escrow Agent's receipt of the Earnest Money.** The Earnest Money
27 shall be applied to the purchase price at closing unless returned to Buyer, released to Seller, or otherwise disbursed in
28 accordance with this Agreement. The Escrow Agent is not a party to this Agreement and does not assume or have any liability for
29 performance or non-performance of any party. Before the Escrow Agent has any obligation to disburse the Earnest Money in the
30 event of dispute, Escrow Agent has the right to require from all parties a written release of liability of the Escrow Agent,
31 termination of the Agreement and authorization or court order to disburse the Earnest Money. If the Escrow Agent is the Listing
32 Broker ("Broker") described above, Broker shall be absolved from any responsibility to make payment to the Seller or Buyer
33 unless the parties enter into a Mutual Release or a Court issues an Order for payment, except as permitted in 876 IAC 8-2-2
34 (release of earnest money). Upon notification that Buyer or Seller intends not to perform, Broker holding the earnest money may
35 release the Earnest Money as provided in this Agreement. If no provision is made in this Agreement, Broker may send to Buyer
36 and Seller notice of the disbursement by certified mail of the intended payee of the Earnest Money. If neither Buyer nor Seller
37 enters into a mutual release or initiates litigation within sixty (60) days of the mailing date of the certified letter, Broker may
38 release the Earnest Money to the party identified in the certified letter. Buyer and Seller agree to hold the Broker harmless from
39 any liability, including attorney's fees and costs, for good faith disbursement of Earnest Money in accordance with this Agreement
40 and licensing regulations.
41 **E.  ADDITIONAL PROVISIONS:** Included in this Agreement are the following addenda: **(Place an "X" on the appropriate line or**
42 **lines)**
43   **X** Financing Addendum                              ____ Feasibility Study Addendum
44   ____ Leased Property Addendum                    ____ Exchange Addendum
45   ____ Zoning/Governmental Approval Addendum   ____ Representations & Warranties of Seller Addendum
46   ____ Alternative Dispute Resolution Addendum   ____ Lead-Based Paint Disclosure Addendum
47   ____ Addendum to Purchase Agreement
48 **F.  CLOSING:** The closing of the sale shall take place at [ ] **(the Title Company)** [X] ( **Seymour Abstract & Title Company**
49 _____ ) on or before _____ , _____ or within **30** days after
50 the end of both the Inspection Period and any of the periods described in any of the above referenced Addenda which are part of
51 this Agreement, whichever is later, (the "Closing Date") or this Agreement shall terminate unless the Closing Date is changed in
52 writing by Seller and Buyer, or otherwise extended pursuant to this Agreement.
53 **G.  POSSESSION:** The possession of the Property shall be delivered to Buyer, subject to the rights of tenants in possession, if any, in
54 its present condition, ordinary wear and tear excepted, on the Closing Date. Seller shall maintain the Property, including

_____ (office use only)
**Page 1 of 5**
Copyright IAR 2022

Authentisign ID: 72896A1F-DE44-4712-A234-0449FC5D1779

55  fixtures, equipment and any included personal property in its present condition until possession is delivered to Buyer.

**H.  REAL ESTATE TAXES: (Check paragraph 1, 2, or 3 below)**

[X]  **1.  Current Year (Lien Basis in Arrears) Indiana Customary Proration:**  The taxes assessed for the current year, due and payable in the year following closing, shall be prorated between Seller and Buyer on a calendar year basis as of the day immediately prior to the Closing Date. All taxes assessed for any prior calendar year and remaining unpaid shall also be paid by Seller.

[ ]  **2.  Prior Year (Cash Basis) Proration When Taxes Are Paid:**  The taxes assessed for the year prior to closing, due and payable during the year of closing, shall be prorated between Seller and Buyer on a calendar year basis as of the day immediately prior to the Closing Date. Buyer shall be responsible for all taxes assessed for the current year due and payable in the year following closing.

[ ]  **3.  Installment Basis:**  Buyer will assume and pay all taxes on the Property beginning with the tax installment due and payable on _____ , _____, and all taxes due thereafter. Seller shall pay all taxes for the Property due and payable before such tax installment not assumed by Buyer.

**For Purposes of 1, 2, and 3 above:**

(A)  If the tax rate or assessment for taxes assessed or payable in the year of closing has not been determined as of the Closing  date, the assessment or rate shall be assumed to be the same as the most recent assessment or rate.

(B)  Taxes which are Seller's responsibility and not yet due as of the Closing Date, shall be credited against the purchase price or cash portion thereof payable by Buyer at closing, and Seller shall have no further liability for such taxes.

(C)  All taxes due and payable on or prior to the Closing Date and shall be paid at or before closing and charged at closing to the responsible party.

(D)  Buyer shall have the right to assume control and responsibility of all real estate tax appeals, and any rebates, refunds or credits shall be prorated between Seller and Buyer as of the Closing Date.

**(NOTE: The succeeding year's tax bill for recently constructed buildings or following reassessment periods may greatly exceed the last tax bill available to the closing agent.)**

**I.  INSURANCE AND RISK OF LOSS:** Seller shall maintain replacement cost (if available) or actual cash value "all risk" insurance on the Property through the Closing Date. Seller's insurance shall be canceled as of the Closing Date and Buyer shall provide its own insurance thereafter. Risk of loss by damage or destruction to the Property prior to the closing shall be borne by Seller. In the event any damage or destruction is not fully repaired prior to closing, Buyer, at its option, may either terminate this Agreement or elect to close the transaction, in which event Seller's right to all insurance proceeds not yet applied to repair of the damage or destruction shall be assigned in writing by Seller to Buyer at closing. Seller shall reimburse Buyer at closing for any insurance deductible.

**J.  CONDITIONS TO CLOSING:** Buyer's obligations under this Agreement are conditioned upon satisfaction of each of the following items which are for the Buyer's benefit and may be waived by Buyer at Buyer's sole discretion within ___5___ days from the last date between Seller and Buyer of this Agreement or any counter-offers (the "Inspection Period").

**1.  Title Commitment:** A commitment for title insurance (the "Commitment") issued by a reputable title insurance company selected or approved by Buyer (the "Title Company") showing marketable title in Seller's name shall be ordered by [X] **(Seller)** [ ] **(Buyer)** promptly upon acceptance of this Agreement and shall be delivered to Buyer within ___20___ days after ___Acceptance of Purchase Agreement___ . At Buyer's request, legible copies of all recorded instruments affecting the Property or recited as exceptions in the Commitment shall also be delivered.

**2.  Survey:** A survey shall be ordered promptly upon acceptance of this Agreement and shall be furnished at [ ] **(Seller's)** [ ] **(Buyer's)** expense within _____ days after _____ . It shall be prepared by a licensed Indiana surveyor selected or approved by Buyer, shall comply with requirements for ALTA Surveys, including optional requirements from Table A, shall reflect whether the Property is located in a designated flood zone area and shall be certified to Buyer, the Title Company and Buyer's lender.

**3.  Title and Survey Approval:** If Buyer has an objection to items disclosed in the Commitment or the survey, Buyer shall make written objections to Seller within ___10___ days after receipt of both the Commitment and survey. Upon the expiration of such period, any item not objected to by Buyer or subsequently approved by Buyer in writing shall be deemed a permitted exception ("Permitted Exception"). If Buyer makes objections, Seller shall have thirty (30) days from the date the objections are made to cure the same, and the Closing Date shall be extended, if necessary. Seller agrees to utilize its best efforts and reasonable diligence to cure any objections, but only to the extent necessary to convey marketable title. If the objections are not satisfied within the time period, Buyer may either terminate this Agreement and receive a refund of the Earnest Money or waive the unsatisfied objections and close the transaction.

**4.  Inspections: (Check paragraph (A) and/or (B) or paragraph (C) below)** Unless Buyer waives inspections under paragraph (C),  Buyer shall have determined that the Property has no unacceptable, adverse environmental or physical condition as provided below.

[X]  (A)  **Environmental Assessment:** A Phase I environmental site assessment ("Phase I") on the Property shall be ordered by [ ] **(Seller)** [X] **(Buyer)** promptly upon acceptance of this Agreement at [ ] **(Seller's)** [X] **(Buyer's)** expense from a reputable, qualified, engineer, acceptable to Buyer. The Phase I shall be conducted in accordance with current ASTM standards unless  otherwise agreed and may also include at Buyer's option the following matters:

(1)  an investigation for the presence of asbestos, radon, lead or polychlorinated biphenyls (PCBs) on the Property; and/or

(2)  an investigation to determine if the Property is located in any regulated or protected area under the jurisdiction of the U.S. Army Corps of Engineers, the U.S. Environmental Protection Agency, the Indiana Department of Environmental Management, the Indiana Department of Natural Resources, the U.S. Fish and Wildlife Service or any other federal, state or local agency.

If Buyer does not make a written objection to any problem(s) revealed in the report within ___30___ days of _____ (office use only)

Copyright IAR 2022
Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX  75201  www.lwolf.com          HPI Package

Authentisign ID: 72896A1F-DE44-4712-A234-0449FC5D1779

121       __**Acceptance of Agreement**__ , the Property shall be deemed to be acceptable. If Buyer determines that the
122 environmental condition is unsatisfactory, Seller shall have a reasonable period of time, not to exceed __30__
123 days, to remediate the condition to Buyer's satisfaction and the Closing Date shall be extended, if necessary. If
124 Seller fails or refuses to remediate, Buyer may either terminate this Agreement and receive a refund of the Earnest
125 Money or waive its objection and close the transaction.

126   [X]   (B)   **Physical Inspections:** Promptly upon acceptance of this Agreement, all physical inspections shall be ordered at
127      [ ] **(Seller's)** [X] **(Buyer's)** expense. Inspections shall be made by qualified inspectors or contractors, selected or
128 approved by Buyer, with written reports delivered to Seller and Buyer. Inspections may include but are not limited
129 to the following: heating, cooling, electrical, plumbing, roof, walls, ceilings, floors, foundation, basement, crawl space,
130 mold, water, storm and waste sewer, well/septic, geotechnical, other: _____ . If Buyer,
131 in its reasonable discretion, believes that an inspection report reveals a major defect in or with the Property, Buyer
132 shall report such defect in writing to Seller within __45__ days of __Acceptance of Agreement__ . If Buyer does not
133 make a written objection to any problem(s) revealed in the report(s) within such time period, the Property shall be
134 deemed acceptable to Buyer. Seller shall have a reasonable period of time, not to exceed _____ days, to repair
135 any such major defect to Buyer's reasonable satisfaction and the Closing Date shall be extended, if necessary. If
136 Seller fails or refuses to repair, Buyer may either terminate this Agreement and receive a refund of the Earnest Money
137 or waive its objection and close the transaction.

138   [ ]   (C)   **Waiver of Inspections:** BUYER HAS BEEN MADE AWARE THAT INDEPENDENT INSPECTION DISCLOSING THE CONDITION OF THE
139 PROPERTY ARE AVAILABLE, AND BUYER HAS BEEN AFFORDED THE OPPORTUNITY TO REQUIRE SUCH INSPECTIONS AS A CONDITION
140 OF THIS AGREEMENT. HOWEVER, BUYER WAIVES THE RIGHT TO OBTAIN INSPECTIONS AND RELIES UPON THE CONDITION OF THE
141 PROPERTY BASED UPON BUYER'S OWN EXAMINATION AND RELEASES SELLER AND LISTING AND SELLING BROKER(S) FROM ANY
142 AND ALL LIABILITY RELATING TO ANY PROBLEM, DEFECT OR DEFICIENCY AFFECTING THE PROPERTY, WHICH RELEASE SHALL
143 SURVIVE THE CLOSING.

144 Buyer and its agents shall have the right to enter upon the Property upon reasonable advance notice and make all inspections
145 provided for herein. Buyer shall restore any damage to the Property resulting from the entry of Buyer or its agents and shall
146 indemnify, defend and hold harmless Seller as to any injury to persons or damage to their property resulting from the
147 negligence of Buyer or its agents in conducting their activities on the Property.

148 **K.**   **PRORATIONS AND SPECIAL ASSESSMENTS:** Interest on any debt assumed or taken subject to, any rents, all other
149 income and ordinary operating expenses of the Property, including but not limited to, public utility charges, shall be prorated as
150 of the day prior to the Closing Date. Any special assessments applicable to the Property for municipal improvements made to
151 benefit the Property prior to the date of acceptance of this Agreement shall be paid by Seller at or before closing. At closing,
152 Buyer will assume and agree to pay all special assessments for municipal improvements which are completed after
153 acceptance of this Agreement.

154 **L.**   **SALES EXPENSES:** All sales expenses are to be paid in cash prior to or at the closing as follows in addition to the other items
155 described in this Agreement.

156                                         **(Check the applicable party who pays)**

| | ITEM | Seller | Buyer |
|---|---|---|---|
| 1. | Release of existing loans and recording releases | X | |
| 2. | Closing Fee | X | X |
| 3. | Preparation of Deed and Vendor's Affidavit | X | |
| 4. | New or assumed loan fees | | X |
| 5. | Title search fee | X | |
| 6. | Title Policy Premium-Owner | X | |
| 7. | Title Policy Premium-Lender | | X |
| 8. | Other Title Company Costs | X | X |

167 **M.**   **DEFAULT:** If Buyer breaches this Agreement, Seller may seek any remedy provided by law or equity, or terminate this
168 Agreement and receive the Earnest Money as liquidated damages. If Seller breaches this Agreement, Buyer may terminate
169 this Agreement and receive a refund of the Earnest Money, or Buyer may seek specific performance or any other remedy
170 provided by law or equity. In the event of Seller default, Seller shall immediately be obligated to pay all brokerage
171 commissions that would have been paid had this transaction closed. In the event of Buyer default, commissions may also be
172 due and payable pursuant to the terms of the applicable brokerage agreements.

173 **N.**   **DUTIES OF BUYER AND SELLER AT CLOSING:**
174      **1. At the closing, Seller shall deliver to Buyer, at Seller's sole cost and expense, except as otherwise provided in this**
175 **Agreement, the following:**
176 (A) A duly executed and acknowledged __General Warranty__ Deed conveying marketable title in fee simple to all of
177 the Property, free and clear of any and all liens, encumbrances, conditions, easements, assessments, reservations and
178 restrictions, except Permitted Exception(s);
179 (B) A pro-forma Owner's Policy of Title Insurance or marked up title commitment (the "Title Policy") issued by the Title
180 Company in the amount of the purchase price, dated as of closing, insuring Buyer's fee simple title to the Property to be
181 marketable subject only to the Permitted Exception(s), and deleting the standard printed exceptions contained in the usual
182 form of the Title Policy;
183 (C) An executed Vendor's Affidavit in form acceptable to the Title Company;
184 (D) A Bill of Sale, duly executed by Seller, containing warranties of title, conveying title, free and clear of all liens, to any
185 personal property specified in Paragraph B;
186 (E) An assignment, duly executed by Seller, of leases, prepaid rents, security deposits, and trade name, and to the extent

                     _____ (office use only)

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX  75201  www.lwolf.com        **HPI Package**

Authentisign ID: 72896A1F-DE44-4712-A234-0449FC5D1779

187 assignable, licenses and permits, warranties or guarantees, and to the extent agreed to be assumed by Buyer, all service,
188 maintenance, management or other contracts relating to the ownership or operation of the Property. Such assignment
189 shall include an indemnity from Seller in favor of Buyer with respect to all claims and obligations arising under such leases
190 and contracts prior to the Closing Date. If Buyer does not agree to assume any such contract, then Seller shall deliver
191 evidence of termination of such contract at closing and shall indemnify Buyer as to all claims and obligations thereunder;

192 (F)  A current rent roll duly certified by Seller and any security or tenant deposits, if applicable;

193 (G) Evidence of its capacity and authority for the closing of this transaction;

194 (H) Certification establishing that no federal income tax is required to be withheld under the Foreign Investment and Real
195      Property Tax Act, or consent to withhold tax from the proceeds of sale as required, unless it is established that the
196      transaction is exempt;

197 (I)  All other executed documents necessary to close this transaction.

198 **2.  At the closing, Buyer shall perform, at Buyer's sole cost and expense, except as otherwise provided in this**
199 **Agreement, the following:**

200 (A) Pay the cash portion of the purchase price in the form of a cashier's check (if the Purchase Price is under $10,000) or other immediately
201      available funds. If purchase price is $10,000 or more, the funds shall be wired unconditionally to closing agent's escrow account;

202 (B) Execute any note(s) and mortgage(s) and cause the funds to be made available to the closing agent for disbursement;

203 (C) Provide evidence of its capacity and authority for the closing of this transaction;

204 (D) Provide to Buyer's lender any title policy as required by the holder(s) of the mortgage(s);

205 (E) An assumption agreement by Buyer (which may be included in Seller's assignment pursuant to Paragraph N.1(E) above) with respect to
206      leases assigned to Buyer and contracts, if any, which Buyer has agreed to assume. Such assumption agreement shall include an indemnity from
207      Buyer in favor of Seller as to claims and obligations arising under such leases and contracts assumed by Buyer from and after the Closing
208      Date;

209 (F)  Execute all other documents necessary to close this transaction.

210 **O.  CONDEMNATION:** Seller shall promptly notify Buyer in writing of the commencement of any condemnation proceedings against any portion of
211 the Property. If such condemnation proceedings are commenced, Buyer, at its option, may (1) terminate this Agreement by written notice to Seller within
212 seven (7) days after Buyer is advised of the commencement of condemnation proceedings, or (2) appear and defend in any condemnation
213 proceedings, and any award shall, at Buyer's election, (a) become the property of Seller and reduce the purchase price by the same amount or (b) shall
214 become the property of Buyer and the purchase price shall not be reduced.

215 **P.  MISCELLANEOUS:**

216 **1.**  Any notice required or permitted to be delivered shall be deemed received when personally delivered or when confirmed as received by
217      facsimile (with a copy sent by United States mail), express courier or United States mail (postage prepaid, certified and return receipt requested)
218      addressed to Seller or Buyer or their designee at the address set forth below the signature of each party.

219 **2.**  This Agreement shall be construed in accordance with the laws of the State of Indiana.

220 **3.**  Time is of the essence. Time periods specified in this Agreement and any addenda are calendar days and shall expire at 11:59 p.m. of the
221      date stated unless the parties agree otherwise in writing.

222 **4.**  This Agreement is binding upon and for the benefit of the parties' respective heirs, administrators, executors, legal representatives,
223      successors, and assigns. No assignment of this Agreement shall release a party from liability for its obligations hereunder.

224 **5.**  If any provision contained in this Agreement is held invalid, illegal, or unenforceable in any respect, the invalidity, illegality,
225      or unenforceability shall not affect any other provision.

226 **6.**  This Agreement constitutes the entire agreement of the parties and cannot be changed except by their written consent.

227 **7.**  By signing below, the parties to this transaction acknowledge receipt of a copy of this Agreement and give their permission
228      to a Multiple Listing Service or other advertising media, if any, to publish information regarding this transaction.

229 **8.**  Broker(s) may refer Buyer or Seller to other professionals, service providers or product vendors, including lenders, loan
230      brokers, title insurers, escrow companies, inspectors, surveyors, engineers, consultants, environmental inspectors and
231      contractors. Broker(s) has no responsibility for the performance of any service provider and/or inspector. Buyer and
232      Seller are free to select providers/inspectors other than those referred or recommended to them by Broker(s).

233 **9.**  Buyer discloses to Seller that Buyer is licensed and holds License # _____. Seller discloses to
234      Buyer that Seller is licensed and holds License # _____.

235 **10.** Where the word "Broker" appears, it shall mean "Licensee" as provided in I.C. 25-34.1-10-6.8.

236 **11.** Any party who is the prevailing party against any other party in any legal or equitable proceeding relating to
237      this Agreement shall be entitled to recover court costs and reasonable attorney fees from the non-prevailing party.

238 **12.** The parties agree that this Agreement may be transmitted between them electronically or digitally. The parties intend that
239      electronically or digitally transmitted signatures constitute original signatures and are binding on the parties. The original
240      document shall be promptly executed and/or delivered. This Agreement may be executed simultaneously or in two or
241      more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same
242      instrument.

243 **13.** Each person executing this Agreement on behalf of a party represents and warrants that he or she has been authorized by all
244      necessary action to execute and deliver this Agreement on behalf of such party.


_____ (office use only)
**Page 4 of 5**
Copyright IAR 2022

Authentisign ID: 72896A1F-DE44-4712-A234-0449FC5D1779

245  **Q.  FURTHER CONDITIONS (List any additional provisions):** _____
246  <u>#1. Buyer shall have Forty-Five (45) Days to complete all Due Diligence,</u>
247  <u>#2. The closing shall take place Thirty (30) Days after completion of Due Diligence Period.</u>
248  <u>#3. No survey shall be ordered, an environmental assessment only if required by the lender.</u>
249  <u>#4. Possession shall be upon closing.</u>
250  _____
251  _____
252  _____
253  _____
254  _____
255  _____
256  _____
257  _____
258  _____
259  _____
260  _____
261  _____
262  _____
263  _____
264  _____
265  **R.  CONSULT YOUR ADVISORS:** Buyer and Seller acknowledge they have been advised that, prior to signing this document,
266  they should seek the advice of an attorney for the legal or tax consequences of this document and the transaction to which it
267  relates. In any real estate transaction, it is recommended that you consult with a professional, such as a civil engineer,
268  environmental engineer, or other person, with experience in evaluating the condition of the property, including the possible
269  presence of asbestos, hazardous and/or toxic materials and underground storage tanks.
270  **S.  CONFIRMATION OF AGENCY RELATIONSHIPS:** Buyer and Seller acknowledge that each has received agency office policy
271  disclosures, had agency explained and now confirm their agency relationships. Buyer and Seller further acknowledge that
272  they understand and accept agency relationships involved in this transaction.
273  **T.  TERMINATION OF OFFER:** Unless accepted by Seller and delivered to Buyer by _____ **3:00** ☐ (A.M.) ☒ (P.M.)
274  ☐ **(Noon)** , the ___**20th**___ day of ___**May**___ , ___**2022**___ , this Purchase Agreement
275  shall be null and void and all parties shall be released of any and all liability or obligations.
276
277                      05/19/2022    **05/19/2022**
278  BUYER'S SIGNATURE              DATE      BUYER'S SIGNATURE                          DATE
     5/19/2022 12:16:28 PM GMT
279  **Darren A. Royalty**
280  PRINTED                                 PRINTED
281  _____        _____
282  (AREA CODE) TELEPHONE NUMBER/FAX NUMBER    (AREA CODE) TELEPHONE NUMBER/FAX NUMBER
283
284  BUYER'S ADDRESS FOR NOTICE PURPOSES

## ACCEPTANCE OF PURCHASE AGREEMENT

287  **SELLER'S RESPONSE: (Check appropriate paragraph number):**
288
289  **On** _____ , **at** _____ ☐ **A.M.** ☐ **P.M.** ☐ **Noon**
290
291  ☐ **1.  The above offer is Accepted.**
292
293  ☐ **2.  The above offer is Rejected.**
294
295  ☒ **3.  The above offer is Countered. See Counter Offer. Seller should sign both the Purchase Agreement and the Counter Offer.**
296                                          _5/20/22_
297  SELLER'S SIGNATURE              DATE      SELLER'S SIGNATURE                          DATE
         *James Auter Cfo*
299  PRINTED                                 PRINTED
300
301  (AREA CODE) TELEPHONE NUMBER/FAX NUMBER    (AREA CODE) TELEPHONE NUMBER/FAX NUMBER
302
303  SELLER'S ADDRESS FOR NOTICE PURPOSES

Prepared and provided as a member service by the Indiana Association of REALTORS®, Inc. (IAR). This form
is restricted to use by members of IAR. This is a legally binding contract, if not understood seek legal advice.
**Form #F05.** Copyright IAR 2022

(office use only)

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201 www.lwolf.com    HPI Package

Authentisign ID: 72896A1F-DE44-4712-A234-0449FC5D1779



**FINANCING ADDENDUM**
COMMERCIAL - INDUSTRIAL REAL ESTATE

### For use only by members of the Indiana Association of REALTORS®

1  Date: __**May 19, 2022**__
2
3  This Addendum is attached to and made a part of the Purchase Agreement dated ____**May 19**____, ____**2022**____, on the
4  Property commonly known as _____**201 S. Jackson Park Dr., 400 South Airport Road**_____ in
5  _____**Jackson**_____ County, _____**Seymour**_____, Indiana ____**47274**____
6
7  Buyer's performance under the Purchase Agreement is conditioned upon Buyer's ability to obtain financing as described below:
8  *(Check the applicable paragraph(s) below)*
9
10 **A. THIRD PARTY FINANCING:** Buyer shall obtain a written loan commitment from a third party in an amount not less than
11 $ **2,400,000.00** ____ U.S. Dollars payable over a term not less than ____**20**____ years with an interest rate not to exceed
12 ☐ ( _____ **% per annum)** ☒ **(current market rate).** Provided that Buyer makes every reasonable effort to obtain a loan
13 commitment, if a loan commitment has not been obtained within _____ days from the date of acceptance, the
14 Purchase Agreement shall terminate. In the event a loan commitment is obtained but not funded without fault of Buyer, the
15 Purchase Agreement shall be null and void and all deposits returned to Buyer less the expenses of title work, survey and
16 attorney fees, all not to exceed $ _____ U.S. Dollars, incurred by Seller to the date of cancellation of this transaction.
17 **B. SELLER FINANCING:**
18   1.  **Principal Amount:** Seller shall provide financing in the principal sum of $ _____ U.S. Dollars.
19   2.  **Type of Financing:** The form of the transaction shall be: **(Check the applicable paragraph letter below)**
20   ☐ **(a) Installment Sale Contract:** The parties shall execute an installment sale contract at closing. Forfeiture provisions
21   are to be released by Seller when Buyer has paid more than $ _____ U.S. Dollars or
22   _____ % of the purchase price. The installment sale contract shall not be recorded. At closing, the parties
23   shall sign a suitable
24   memorandum of the installment sale contract in recordable form.
25   ☐ **(b) Note and Mortgage:** At closing, Buyer shall execute a promissory note to Seller secured by a mortgage of the
26   Property.
27   3.  **Interest Rate:** _____
28   4.  **Payment Schedule: [Check Paragraph Letter (a), (b) or (c)]**
29   ☐ (a) In full on the _____ day of _____ , _____ , with accrued interest being due and payable
30   _____
31   ☐ (b) In ☐ **(monthly)** ☐ **(annual)** ☐ **(other:** _____ ) installments of $ _____
32   U.S. Dollars ☐ **(including interest)** ☐ **(plus interest)** each, beginning on _____ the day of _____
33 , _____ , and continuing regularly until the _____ day of _____ , _____
34   when the entire amount of principal and interest remaining unpaid shall be due and payable.
35   ☐ **(c)** Interest only in ☐ **(monthly)** ☐ **(annual)** ☐ **(other:** _____ ) installments of $ _____
36   U.S. Dollars each, beginning on the _____ , day of _____ , _____ and continuing
37   regularly until the _____ day of _____ , _____ , and thereafter in ☐ **(monthly)**
38   ☐ **(annual)** ☐ **(other:** _____ ) installments of $ _____ U.S. Dollars, ☐ **(including**
39   **interest)** ☐ **(plus interest)** beginning on the _____ day of _____ , _____ , and
40   continuing until the _____ day of _____ , _____ , when the entire amount of
41   principal and interest remaining unpaid shall be due and payable.
42   5.  **Final Maturity Date:** _____
43   6.  **Personal Liability: [Check paragraph letter (a) or (b)]**
44   ☐ **(a)** The note or contract shall provide for no personal liability in the event of a default. The Seller may look only to the
45   security provided by the mortgage or contract to enforce the payment of the indebtedness. The only exceptions shall be
46   for non-payment of real estate taxes, assessments or insurance, misapplication of rents, environmental liabilities caused
47   by Buyer, Buyer's fraud, and waste of the Property.
48   ☐ **(b)** The note or contract shall provide for personal liability in the event of a default, and a separate personal guaranty of
49   payment and performance shall be given at closing by: _____ .
50   7.  **Due on Sale:** The mortgage or contract shall provide that if all or any part of the Property or an interest therein is sold or
51   transferred by Buyer without Seller's prior written consent, the Seller may, at its option, declare all the sums secured by
52   the mortgage or contract to be immediately due and payable.
53   8.  **Property Taxes and Insurance:** Buyer shall pay the Property taxes and insurance in addition to principal and interest
54   9.  **Prepayment Premium: [Check paragraph letter (a) or (b)]**
55   ☐ **(a)** Prepayment premium as follows: _____

_____ (office use only)
**Page 1 of 2**
Copyright IAR 2022

Authentisign ID: 72896A1F-DE44-4712-A234-0449FC5D1779

56   ☐   **(b)**   The note or contract may be prepaid in whole or in part at any time without premium. Any prepayments are to be
57   applied toward the payment of the installments of principal last maturing, but interest shall immediately cease upon
58   amount of principal prepaid.

59   **10. Subordination:** The lien securing payment of the note or contract will be inferior to any lien securing any loan assumed,
60   taken subject to or given in connection with third party financing.

61   **11. Credit Approval:** Within _____ days of acceptance of the Purchase Agreement, Buyer shall furnish to Seller
62   financial information in detail reasonably satisfactory to Seller. Buyer authorizes Seller to engage the services of a
63   reputable credit reporting agency for this purpose at Buyer's expense, and Seller shall notify the Buyer within
64   _____ days of receipt of the financial information and the credit report of the approval or disapproval of Buyer's
65   credit.

66   **12. Documents:** All documents evidencing the Seller financing shall be prepared in commercially reasonable and customary
67   forms by ☐ **(Seller's)** ☐ **(Buyer's)** attorney at ☐ **(Seller's)** ☐ **(Buyer's)** expense. This Addendum is not intended to
68   include all terms and conditions that should be included in the form(s) of installment sale contract, promissory note,
69   mortgage, personal guaranty or other financing documents to be executed at closing.

70   **C.**   **OTHER FINANCING TERMS:** _____
71   _____
72   _____
73   _____
74   _____
75   _____
76   _____
77   _____
78   _____
79
80
81
82
83      05/19/2022
84   **05/19/2022**                       5/20/22
85   BUYER'S SIGNATURE   DATE     SELLER'S SIGNATURE         DATE
86
87
88   **Darren A. Royalty**               James Aulder   CFO   Home Products
89   PRINTED                     International - North
90                           America, Inc
91                       PRINTED
92
93   BUYER'S SIGNATURE   DATE     SELLER'S SIGNATURE         DATE
94
95
96
97   PRINTED                     PRINTED



Prepared and provided as a member service by the Indiana Association of REALTORS®, Inc. (IAR). This form
is restricted to use by members of IAR. This is a legally binding contract, if not understood seek legal advice.
**Form #F07.** Copyright IAR 2022

EQUAL HOUSING
OPPORTUNITY

_____ (office use only)
**Page 2 of 2**

# Exhibit B

# AUCTION AGREEMENT

**THIS AUCTION AGREEMENT**, dated as of May __, 2022 (this "Agreement"), is made by and among HYPERAMS, LLC, an Illinois limited liability company, with its principal place of business at 980 Carnegie Street, Rolling Meadows, IL 60008 ("HYPERAMS"), and Branford Auctions, LLC, a Connecticut limited liability company, with its principal place of business at 896 Main Street, Branford, CT ("Branford"), on the one hand, and Home Products International – North America, Inc. (the "Company"), a Delaware corporation, with its principal place of business at 4501 W. 47th Street, Chicago, IL 60632, on the other hand.

## WITNESSETH:

**WHEREAS**, the Company manufactures a variety of household and commercial products, including plastic storage totes, carts, and bins, at its plant in Chicago, Illinois, and steel ironing boards at its plant in Seymour, Indiana;

**WHEREAS**, has commenced an orderly winddown of its operations and is in the process of preparing a voluntary petition for bankruptcy protection (the "Chapter 11 Bankruptcy Case") under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Illinois (the "Bankruptcy Court");

**WHEREAS**, the Company desires to engage an experienced auctioneer knowledgeable and skilled in the disposition of the types of machinery, equipment and other assets located at the Company's plants in Chicago, Illinois and Seymour, Indiana;

**WHEREAS**, HYPERAMS and Branford (collectively, the "Auctioneer") are experienced auctioneers and have, amongst themselves, entered into an agreement to share responsibilities to assist the Company in the Company's efforts to sell certain of its machinery, equipment and other assets located at the Company's plants in Chicago, Illinois and Seymour, Indiana, as set forth herein; and

**WHEREAS**, subject to an entry of an order of the Bankruptcy Court in the Chapter 11 Case approving this Agreement in form and substance acceptable to both Auctioneer and the Company (the "Approval Order"), the Auctioneer is willing to serve as the Company's asset disposition agent, for the purpose of disposing of such assets as specified herein, upon the terms and conditions and in the manner set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1

## 1.    DEFINITIONS

For the purposes of this Agreement, the terms listed below shall have the respective meanings indicated:

1.1    "47th Street Facility" means the Company's plastics division location at 4501 W. 47th Street, Chicago, IL 60632.

1.2    "Archer Facility" means the Company's plastics division location at 5507 S. Archer, Chicago, IL 60638.

1.3    "Assets" shall mean (i) the M&E Assets owned by the Company and physically located at the Facilities, and will specifically include, without limitation, the items set forth on **Exhibit 1.1** hereto; (ii) effective on the Other Asset Start Date, the Other Assets.

1.4    "Auction" shall mean a live webcast or timed online only auction sale of the Assets to be conducted by Auctioneer on behalf of Company.

1.5    "Buyer's Premium" shall mean any industry standard charged to buyers during the Sale (which Buyer's Premium shall not exceed 18%, except if sale proceeds are paid by credit card, in which case such Buyer's Premium shall not exceed 21%).

1.6    "Chicago Facilities" shall mean, collectively, the 47th Steet Facility and the Archer Facility.

1.7    "Facilities" shall mean the Chicago Facilities and the Seymour Facilities.

1.8    "Guaranteed Amount" shall have the meaning set forth in Section 4.1

1.9    "Inventory" shall mean, collectively, all remaining resin in bulk, other raw materials, and finished goods.

1.10    "M&E Assets" shall mean, collectively, the Company's fabrication equipment, presses, machinery, injection molding machines, molds, parts, tools, support equipment, miscellaneous raw materials and resins, packaging, furniture, and fixtures.

1.11    "Other Assets" means the remaining Inventory not currently under a purchase order and intellectual property as of the Other Asset Start Date. Any proceeds from the Resolution and Settlement Agreement pertaining to the elimination of the anti-dumping tariffs are not to be included in connection with this Agreement.

1.12    "Other Asset Start Date" means the date that the Company informs Auctioneer to commence the sale of the Other Assets; but in no event later than June 24, 2022.

2

1.13    "Potential Purchasers" shall include the entities identified in Exhibit 1.2.

1.14    "Proceeds" shall mean the amount of sale proceeds received for any Asset during the Sale, exclusive of Buyer's Premium.

1.15    "Sale" shall mean the process of setting up for the Auction, making presales of the Assets, holding the Auction of the Assets, conducting sales of any Assets remaining unsold after the Auction and managing the collection of Proceeds and the removal of the Assets, along with the disposition of the Other Assets commencing on the Other Asset Start Date.

1.16    "Sale Budget" means the budget for the Sale Expenses related to the Other Assets, which shall be agreed to in writing on or prior to the Other Asset Start Date.[1]

1.17    "Sale Expenses" shall mean, with respect to the Sale, direct operating expenses incurred by Auctioneer in connection therewith.  Such Sale Expenses shall not include any occupancy expenses with regard to the Facilities.

1.18    "Sale Start Date" shall mean the date that Auctioneer is allowed access to begin to set up and catalog the Assets to conduct the Sale.  The Sale Start Date shall be no later than (i) one (1) business day after entry of the Approval Order if the Approval Order is entered on or before June 6, 2022; (ii) as agreed to be by the parties in writing if the Approval Order is entered after June 6, 2022.

1.19    "Sale Term" shall mean the period of time beginning with the date of this Agreement and ending on the Sale Termination Date.

1.20    "Sale Termination Date" shall mean (i) with respect to the M&E Assets (A) Auctioneer shall use its best efforts to complete the sale on or before the 90th day after the Sale Start Date for the Seymour Facilities and the Archer Facility; and (B) Auctioneer shall use its best efforts to complete the sale on or before the 90 days after the Sale Start Date for the 47th Street Facility; in each case as may be extended by the parties in writing and (ii) with respect to the Other Assets, a date to be agreed to by the parties in writing.

1.21    "Services" shall mean the asset disposition services to be performed by Auctioneer pursuant to Section 2.2 of this Agreement.

1.22    "Seymour Facilities" shall mean, collectively, the Company's metal stamping locations at 110 West 9th Street, Seymour, Indiana 47424, 885 North Chestnut Street, Seymour, Indiana 47424 and 201 S. Jackson Park Drive, Seymour, Indiana 47424.

---

[1] NTD: Sales Budget not relevant to sale of M&E on account of Guaranteed Amount and expense cap

1.23 "Termination Fee" shall be equal to the sum of Guaranteed Amount plus Two Hundred Fifty Thousand Dollars ($225,000) multiplied by five percent (5.0%), calculated as follows: ($3,800,000 + $225,000) * 5% = $201,250.

## 2.    ASSET DISPOSITION AGENT

2.1    The Company hereby appoints Auctioneer, and Auctioneer hereby agrees to serve, as an independent asset disposition agent to the Company in connection with the conduct of the Sale and shall be the sole and exclusive Auctioneer to conduct the Services with respect to the Assets during the Sale Term.

2.2    On the terms and conditions set forth herein, during the Sale Term, Auctioneer shall provide the Company with the following Services with respect to the conduct of the Sale:

(a)    move, organize, implement, manage and conduct the Sale of all the Assets; Auctioneer may abandon in place any Assets not sold or removed by purchasers during the Sale, provided that any Assets abandoned by Auctioneer may be sold, removed or otherwise disposed by the Company or its designee free and clear, and without any payment, of any claim or interest of Auctioneer;

(b)    provide an adequate number, at Auctioneer's sole discretion, of qualified personnel to conduct the Sale set-up and Auction, supervise the Asset removal and, as may be applicable, manage the orderly liquidation of the Inventory in conjunction with the Company;

(c)    implement an advertising campaign to effectively sell the Assets at the Sale. Auctioneer shall be authorized to use the business name of "Home Products International" in advertising placed by Auctioneer;

(d)    lot, tag and catalogue those Assets to be sold during the Auction; and

(e)    provide such other related services, deemed necessary or prudent by Auctioneer to effectively maximize the proceeds from the sale of such Assets.

2.3    In connection with the Services, Auctioneer shall directly retain and engage the personnel as it deems necessary.  Such personnel are employees, or independent contractors engaged as agents, of Auctioneer, and are not and shall not be deemed to be employees of the Company in any manner whatsoever.  In consideration of Auctioneer's engagement of the necessary personnel, Sale Expenses shall include such personnel's compensation and expenses related to the Services in amounts not to exceed those set forth in the Sale Budget for such matters.

2.4    All sales of Assets shall be made by Auctioneer as agent in fact for the Company. Title to the Assets shall remain with the Company until the Assets are sold to buyers and payment in full therefore has been received.

4

2.5     Auctioneer is authorized to accept cash, guaranteed checks or wire transfers as payment for the Assets sold.

2.6     Auctioneer shall sell the Assets "**AS IS**", without any representations of any kind or nature whatsoever, including as to merchantability or fitness for a particular purpose, and without warranty or agreement as to their condition.  The Company acknowledges that Auctioneer is acting solely in the capacity of Auctioneer for the Company and has no knowledge with respect to the fitness or usability of any of the Assets.

2.7     Auctioneer reserves the right to sell the Assets before or after the Auction if reasonably necessary.  The Assets may be sold in such lots as Auctioneer may reasonably determine.

## 3.     EXPENSES

3.1     Sale Expenses related to the sale of the M&E Assets at the Auction shall be the sole responsibility of the Auctioneer.  To the extent that Sale Expenses must be paid in advance of receipt of proceeds of any Auction, Auctioneer shall be responsible for the payment of such Sale Expenses subject to recovery as provided in Section 4.1 below.

3.2     Sale Expenses related to the sale of the Inventory on an orderly basis shall consist of actual personnel expenses, travel, marketing and outside sales commissions not to exceed Fifty Thousand Dollars ($50,000).  Auctioneer shall advance those Sale Expenses and shall reimburse itself for such out of the Proceeds provided that Auctioneer has delivered reasonable documentation of such Sale Expenses related to the sale of Inventory to the Company.  In the event that payment of the Proceeds is made to the Company pursuant to Section 8.11 of this Agreement or otherwise, Auctioneer shall be permitted to remit to the Company an invoice each week for payment of its commissions and Sales Expenses related to Proceeds collected by the Company, which invoice shall be paid within two business days.

3.3     Auctioneer shall collect from the applicable buyers all sales taxes required to be paid in connection with the Auction of the Assets, if any, and shall promptly remit such taxes to the appropriate governmental authority. Auctioneer shall prepare and process all reporting forms, certificates, reports and other documentation required in connection with the payment of all applicable sales taxes with respect to the sale of the Assets.  The Company shall not be liable for any applicable sales taxes arising in connection with the Sale except to the extent that it invoices Inventory pursuant to Section 8.11 of this Agreement.

## 4.     AUCTIONEER'S GUARANTEE AND FEE

4.1     Auctioneer hereby guarantees to the Company that the Proceeds from the Sale of M&E Assets shall be no less than $3,800,000 (the "Guaranteed Amount'').  Auctioneer shall pay

5

$760,000 on account of the Guaranteed Amount to the Company within two (2) Business Days of the later of the entry of the Approval Order and completion of the Inspection, as defined below (the "Initial Payment").

Prior to paying the Initial Payment, Auctioneer will be allowed to inspect the M&E Assets set forth on Schedule 1.1 (the "Inspection") to ensure that the M&E Assets set forth on Schedule 1.1 are actually located at the Facilities and in normal working order and that press 55 has been repaired and is in normal working order.  If any of the M&E Assets set forth on Schedule 1.1 have been removed, or the M&E Assets set forth on Schedule 1.1 are not deemed to be in normal working condition, the Guaranteed Amount shall be adjusted in an agreed upon amount.

The Proceeds from the sale of the M&E Assets at the Auction shall be paid as follows: (a) the first Proceeds in an amount equal to Initial Payment paid by Auctioneer to the Company shall be retained by Auctioneer; (b) the next $225,000 in Proceeds shall be paid to the Auctioneer to cover Sale Expenses; (c) the next Proceeds shall be paid to the Company until the Company has received the Guaranteed Amount (inclusive of the Initial Payment); and (d) all amounts in excess of the sum of the  Guaranteed Amount plus $225,000 shall be split 95% to the Company and 5% to the Auctioneer.

Auctioneer acknowledges and agrees that Auctioneer shall be responsible for paying Company the Guaranteed Amount, regardless of the actual proceeds from the Sale of the M&E Assets.

4.2     All Proceeds from the Sale or otherwise from the sale of the Assets, from any source whatsoever, shall be immediately deposited by Auctioneer in a separate account.

4.3     Auctioneer shall remit to Company any Proceeds due hereunder pursuant to section 4.1 in the following manner:  (1) $760,000 of the Proceeds from the Auction of the M&E Assets located in the Seymour Facilities within ten business days of the closing of that Auction; (2) $1,250,000 of the Proceeds from the auction of the M&E Assets for the M&E Assets located in the Chicago Facilities within ten business days of the closing of that Auction; and (3) with a final reconciliation and all remaining Proceeds related to the Auctions of the M&E Assets due within fifteen business days of the final Sale Termination Date.

4.4     Auctioneer will charge a reasonable and customary Buyer's Premium to purchasers of the M&E Assets at the Auctions.  Any such buyer's premium collected will not be considered Proceeds hereunder and will be the sole property of the Auctioneer as part of its compensation for providing the Services hereunder.

4.5     Auctioneer shall be entitled to a commission on the sale of all Inventory hereunder of (i) 5% of the gross proceeds of the orderly liquidation of such Inventory or (ii) the industry standard Buyer's Premium if the Inventory cannot be sold orderly and must be included in the Auction.  Auctioneer will remit the Proceeds related to the sale of the Inventory, net of the Sale Expenses and its commission hereunder within ten business days after the end of each

6

calendar month.  In the event that payment of the Proceeds related to the sale of Inventory is made to the Company pursuant to Section 8.11 of this Agreement or otherwise, Company will remit the Sale Expenses and Auctioneer's commission hereunder related to the Proceeds of the sale of such Inventory to Auctioneer pursuant to Auctioneer's invoice as set forth in Section 3.2 of this Agreement.

4.6     Auctioneer shall be entitled to a commission on the sale of the Intellectual Property, if any, of 2% of the gross proceeds thereof.  Auctioneer will remit the Proceeds related to such sales, net of its commission, within ten business days of the Sale Termination Date.

4.7     Auctioneer acknowledges that the Company is in communication with certain Potential Purchasers, as set forth in Schedule 1.2, who have expressed an interest in acquiring the Chicago Facilities as a going concern, including the M&E Assets set forth in this Agreement. Should the Company enter into a sale and purchase agreement with one of those entities on Schedule 1.2 at a price that exceeds the sum of the Guaranteed Amount, the Sale Expenses and Termination Fee (the "Going Concern Sale Agreement"), with a Potential Purchaser to sell the Chicago Facilities, and specifically including the M&E Assets set forth in this Agreement, the Auctioneer shall: (a) be entitled to a Termination Fee, full repayment of any portion of the Guaranteed Amount that has already been paid to the Company, , and its Sale Expenses incurred as of the execution date of the Going Concern Sale Agreement; (b) cease its efforts to sell the M&E Assets located at the Chicago Facilities; and (c) continue its efforts to sell the M&E Assets located at the Seymour Facilities at a 12% commission and the Buyer's Premium and actual Sale Expenses not to exceed $75,000.  Gross Sale Proceeds from the result of the Seymour Auction would be remitted to the Company.  The Company acknowledges that any transaction pursuant to a Going Concern Sale Agreement would need to close on or before July 6, 2022, or the Auctioneer will be allowed to fulfill its obligations under this Agreement.   The  Auctioneer and the Company further acknowledge that the Company's senior secured lender has certain consent and lien rights as applied to the sale of the Company's assets and that the Company will need to seek the consent of the Company's senior secured lender prior to the execution of any Going Concern Sale Agreement.

5.     **REPRESENTATIONS AND WARRANTIES OF AUCTIONEER**

5.1     Auctioneer hereby represents, warrants and covenants in favor of the Company as follows:

(a)     Auctioneer has taken all necessary action required to authorize the execution, performance and delivery of this Agreement, and to consummate the transactions contemplated hereby;

(b)     This Agreement is a valid binding obligation of Auctioneer enforceable in accordance with its terms;

7

(c)     To the best of Auctioneer's knowledge, no action or proceeding has been instituted or threatened affecting the consummation of this Agreement or the transactions contemplated herein;

(d)     Auctioneer shall not be responsible for any purchaser that defaults on its obligation to complete a purchase of any of the Assets, but will use its best efforts to resell any Assets affected by such default;

(e)     Auctioneer in no way guarantees the results from the sale of the Inventory or Intellectual Property; and

(f)     Auctioneer shall perform all Services in a professional manner.

## 6.      REPRESENTATIONS AND WARRANTIES OF THE COMPANY

6.1     The Company hereby represents, warrants and covenants in favor of Auctioneer as follows (subject to entry of the Approval Order):

(a)     The Company has taken all necessary action required to authorize the execution, performance and delivery of this Agreement, and has taken all steps necessary and has good and valid authority to consummate the transactions contemplated hereby, including the conduct of the Auction and completion of the Sale;

(b)     The Company has legal title to the Assets and, the Company has the legal authority to sell the Assets to the general public free and clear of any liens, claims or encumbrances and to distribute the Proceeds as set forth in this Agreement;

(c)     This Agreement is a valid and binding obligation of the Company enforceable in accordance with its terms; and

(e)     No action, arbitration, suit, notice, or legal, administrative or other proceeding before any court or government body has been instituted by or against the Company relating to the Assets or has been settled or resolved, or to the Company's knowledge, is threatened against the Company or the Company's business or properties, that questions the validity of this Agreement or that, if adversely determined, would adversely affect the conduct of the Sale.

8

## 7.    AFFIRMATIVE DUTIES OF AUCTIONEER

7.1    Auctioneer shall and hereby agrees to reimburse, indemnify, defend and hold the Company and its officers, directors, agents, and employees, harmless from and against any and all known or unknown damage (including without limitation, any personal injury, death or property damage), loss, expense (including reasonable attorneys' fees) or penalty, liability or any claim or action therefore, by or on behalf of any person, which the Company or its indemnified affiliates may incur as a direct or indirect consequence in whole or in part of: (a) Auctioneer's breach of this Agreement; (b) any claims asserted by the Auctioneer's employees or agents, including the Auctioneer's employees' or agents' payroll claims (wage claims, claims for taxes required to be withheld from wages, social security, etc.), or unemployment compensation claims; (c) the gross negligence or intentional misconduct of Auctioneer or any of its agents, employees, principals or other personnel in performing the Services; and/or (d) the breach by Auctioneer of any of its representations, warranties or other obligations under this Agreement.

7.2    Auctioneer shall provide sufficient labor for the set up and conduct of the Sale.

7.3    Auctioneer shall provide an accounting of the Sale no later than the fifteen business days after the Sale Termination Date.  With such accounting, Auctioneer shall also deliver any remaining unpaid funds due and payable to the Company hereunder.

## 8.    AFFIRMATIVE DUTIES OF THE COMPANY

8.1    Throughout the Sale Term Auctioneer shall have the right to the use and occupancy of, and peaceful and quiet possession of, the Facilities to conduct the Sale and to allow the removal of the Assets from the Facilities.  Such occupancy will be free of charge  and the Company shall be solely liable for any expenses (other than the Sale Expenses) incurred in connection with the maintenance or operation of the Facilities, including but not limited to payment of all occupancy charges, including rent, security, local telephone, trash services, property taxes, utilities, water, sewer, internet, dumpster services and all other related costs.

8.2.    Company shall, through the date of the Sale Termination Date maintain in good working order, condition and repair, at its sole expense, all heating systems, sprinkler systems, air conditioning systems, elevators and all other mechanical devices reasonably necessary to allow for the conduct of the Auction and the removal of the Assets from the Facilities.  The Approval Order will provide Auctioneer proof of its right to guarantee peaceful and quiet possession of the Facilities to conduct the Sale upon execution hereof.

8.3    The Company shall and hereby agrees to defend, indemnify, and hold harmless Auctioneer and its agents, employees, principals and other personnel from and against any and all known or unknown losses, damages (including without limitation, any personal injury, death or property damage), liabilities, claims, actions (including removal of toxic waste), judgments,

9

penalties and fines, court costs and legal or other expenses (including reasonable attorneys' fees) which the Auctioneer may incur as a direct or indirect consequence in whole or in part of: (i) the environmental condition of the real property on which each Facilities is located, and/or any asserted damage, if any, to adjacent land owners, including but not limited to, alleged or actual violations of, or alleged or actual liability for contamination under, common law or environmental statutory local, state or federal law, including but not limited to, the Federal Water Pollution Control Act, the Clean Air Act, the Resource Conservation and Recovery Act, the Comprehensive Environmental Response, Compensation, and Liability Act, the Toxic Substances Control Act, the Occupational Safety and Health Act, the Emergency Planning and Community Right-to-Know Act, and the Safe Drinking Water Act, and comparable state and local laws, all as now or may at any time hereafter be in effect; (ii) subject to Section 3.3, the Company's failure to pay to the appropriate taxing authority any taxes required to be paid by the Company during the Sale Term in accordance with applicable law; (iii) negligence or intentional misconduct of the Company or its agents, employees, representatives and principals in connection with the Sale; and (iv) liens, claims, interests and encumbrances asserted against the Assets; (v) the breach by the Company of any of its representations, warranties or other obligations under this Agreement.

8.4     The Company shall deliver the corresponding certificates of titles for all titled assets included in the Assets for subject titled assets, if any.

8.5     Company grants a limited license to Auctioneer to use Company's name, trade names, trademarks, and logos in connection with the Auction, including but not limited to its marketing and in connection with Auctioneer's own marketing materials and efforts. Auctioneer shall be authorized to use the name "Home Products International" in its advertising of the sale of the Assets and in its promotional materials.

8.6     From the Effective Date of this Agreement, Company shall refer all inquiries about the Assets to Auctioneer and shall refrain from communicating substantively with any such inquirers. Company may not otherwise dispose of, or withdraw, any Assets from the Auction without consent of Auctioneer.

8.7     Company agrees that Auctioneer may, in its sole discretion, decline to sell any of the Assets, if, in Auctioneer's opinion, such sale would expose Auctioneer or a purchaser to a claim of liability by any person as a result of such sale.

8.8     Company shall be responsible for any oils, grease, contaminated materials, regulated substances, hazardous materials, and toxic or noxious substances that may be found at the Facilities, whether or not their point of origin is from the Assets.

8.9     Company will, immediately after the Auction, disconnect any utilities that are connected to any of the sold Assets in a reasonable manner designed to protect such Assets and the Facilities, at Company's sole cost and sole risk. Purchasers will be solely responsible for

10

rigging and transport sold Assets. Auctioneer will not be responsible for the disconnection or transport of any sold Assets. Company agrees that with respect to any export transaction involving any of the Assets, Company shall be the U.S. principal party in interest.  Accordingly, Company authorizes Auctioneer to provide Company's federal employer identification number ("EIN") to buyers, their agents, customs officials, or similar parties for the purposes of completing a shipper's export declaration form or any documentation necessary to facilitate the respective purchaser's export of the purchased Assets.

8.10    Company agrees to provide two dedicated forklift drivers and a dedicated "mold expert" to assist in the proper setup and display of the molds, as well as to relocate inventory and packaging in order to clear space in the 47th Street building of the Chicago Facilities to facilitate such display efforts.

8.11    Company will manage the invoicing of all sales of Inventory made during the orderly phase of this engagement, and will also provide the necessary personnel to pick, pack and prepare such items for shipment to customers.  Company will also handle the preparation and filing of any sales tax returns related to any Inventory sales that may be made.

## 9.    INSURANCE

9.1    The Company warrants that it will maintain throughout the Sale Term liability insurance policies (including comprehensive public liability insurance and auto liability insurance) covering injuries to persons and property in or in connection with the operation of the Facilities, as well as casualty insurance, on the Assets, consistent with the levels maintained on a historical basis.  The Company shall deliver certificates of insurance evidencing such insurance policies to Auctioneer on the Sale Commencement Date and shall cause Auctioneer to be listed as an additional insured or loss payee, as applicable, with respect to all such policies related to the Assets.  The Company shall be responsible for the payment of all deductibles, self-insurance and other amounts payable in connection with any claim asserted under such policies, except for any claims arising directly from the gross negligence or willful misconduct of Auctioneer, or its employees, representatives, agents or other personnel, as determined by a final and non-appealable order of a court of competent jurisdiction.  The proceeds of any insurance resulting from a casualty or loss to the M&E Assets shall be paid first to Auctioneer to cover the Sale Expenses it has expended plus the Guaranteed Amount it has paid.  All remaining insurance proceeds will be retained by the Company.

9.2    Auctioneer shall maintain at Auctioneer's cost and expense throughout the Sale comprehensive public liability insurance policies covering injuries to persons and property in or in connection with Auctioneer's services hereunder and shall cause Company to be an additional insured with respect to all such policies.

## 10.    LIMITATION OF LIABILITY AND FORCE MAJEURE

11

10.1     Auctioneer's maximum liability for the breach of any obligation under this Agreement or otherwise in relation to the Auction, and for damages of any type sustained by Company or any third party shall be limited to the amounts actually received by Auctioneer for compensation under this Agreement. Company also acknowledges that Auctioneer may utilize third party websites and other technology, to the extent the Auction is to be conducted via the internet, and that Auctioneer does not warrant that the use of such technology will be without error or interruption. Company agrees that it will not seek redress from Auctioneer for any such errors or interruptions.

10.2     Auctioneer shall not be liable or responsible to Company, nor be deemed to have defaulted or breached this Agreement, for any failure or delay in fulfilling or performing any term of this Agreement when and to the extent such failure or delay is caused by or results from acts or circumstances beyond the reasonable control of the Auctioneer including, without limitation, acts of God, flood, fire, earthquake, explosion, governmental actions, war, invasion or hostilities (whether war is declared or not), terrorist threats or acts, riot, or other civil unrest, national emergency, revolution, insurrection, epidemic, pandemic, public health emergencies, quarantines, lock-outs, strikes or other labor disputes (whether or not relating to either Party's workforce), restraints or delays affecting the Auction or inability or delay in obtaining supplies of adequate or suitable materials, telecommunication breakdown or power outage, suspension or interruption of regular commercial air traffic, or the inability of either Party's personnel to come to work due to any of the aforementioned (a "Force Majeure Event"). The Auctioneer shall give notice within 5 days of the occurrence of a Force Majeure Event to the Company, stating the period of time the occurrence is expected to continue if such period of time can be reasonably estimated. The Auctioneer shall use diligent efforts to ensure the effects of such Force Majeure Event are minimized. The Auctioneer shall resume the performance of its obligations as soon as reasonably practicable after the removal of the event giving rise to the Force Majeure Event. In the event that the event giving rise to the Force Majeure Event remains in effect for a period of 30 days following written notice given by Auctioneer under this Section 11.2, Auctioneer may thereafter terminate this Agreement upon 10 days' written notice; provided, however, that the Company shall be allowed twenty days after receipt of such notice to cure such Force Majeure Event if such Force Majeure Event is one capable of being cured.

## 11.    MISCELLANEOUS

11.1     Any notice or other communication under this Agreement shall be in writing and may be delivered personally or sent by facsimile or by prepaid registered or certified mail, addressed as follows:

(i)        in the case of Auctioneer:
Robert T. Pabst
HYPERAMS, LLC
980 Carnegie Street
Rolling Meadows, IL 60008
Attn: Robert Pabst
rpabst@hyperams.com

12

(ii)    in the case of the Company:
Home Products International – North America Inc
4501 West 47th Street
Chicago, Illinois 60632
Attn: Jim Auker, CFO
Email: jauker@homzproducts.com

11.2    This Agreement shall be governed by and interpreted in accordance with the internal laws of the State of Illinois, without reference to any conflict of laws provisions.

11.3    In the event any term or provision contained within this Agreement shall be deemed illegal or unenforceable, then such offending term or provision shall be considered deleted from this Agreement and the remaining terms shall continue to be in full force and effect.

11.4    This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior negotiations and understandings and can only be modified by a writing signed by the Company and Auctioneer.

11.5    Neither the Company nor Auctioneer shall assign this Agreement without the express written consent of the other.  This Agreement shall inure to the benefit of, and be binding upon, the parties and their respective successors and permitted assigns.

11.6    This Agreement may be executed in several counterparts, each of which when so executed shall be deemed to be an original and such counterparts, together, shall constitute one and the same instrument.  Delivery by facsimile of this Agreement or an executed counterpart hereof shall be deemed a good and valid execution and delivery hereof or thereof.

11.7    Nothing contained hereof shall be deemed to create any relationship between Auctioneer and the Company other than an agency relationship.  It is stipulated that the parties are not partners or joint venturers.

11.8    All amounts referenced herein are in U.S. dollars, and only U.S. dollars will be accepted as Proceeds from the Sale.

(Signature Page Follows)

13

**HYPERAMS, LLC**

By:_____
Name: _____
Its:_____

**BRANFORD AUCTIONS, LLC**

By: _____
Name: _____
Its: _____

**HOME PRODUCTS INTERNATIONAL –
NORTH AMERICA, INC.**

By:_____
Name: _James Auber_____
Its: _Secretary and CFO_____

14

**HYPERAMS, LLC**

By: *Robert T. Pabst*

Name: Robert T. Pabst

Its: Chief Operating Officer


**BRANFORD AUCTIONS, LLC**

By:

Name:

Its:


**HOME PRODUCTS INTERNATIONAL –
NORTH AMERICA, INC.**

By:

Name:

Its:


14

# LIST OF EXHIBITS

1.1           M&E Asset List
1.2           List of Company Identified Purchasers

4877-7176-8098.2

EXHIBIT **1.1**
**M & E ASSET LIST**

**(See attached)**

4877-7176-8098.2

**EXHIBIT 1.2**
**Company Identified Purchasers**

1. Material Difference Technologies (MDT)
2. HMS Mfg Co
3. Equipment Finance Group (EFG)
4. Starplast

4877-7176-8098.2